MRS. A. Y. ARMSTRONG V. HONORABLE J. H. WALKER, COMMISSIONER OF THE GENERAL LAND OFFICE.

No. 6273. Decided June 30, 1934.
(73 S. W., 2d Series, 520.)

*O. R. Armstrong,* of El Paso, for relator.

*James V. Allred,* Attorney General, *R. W. Yarbrough,* Assistant Attorney General, for respondent.

MR. JUDGE CRITZ delivered the opinion of the Commission of Appeals, Section A.

This is an original mandamus proceeding instituted in the Supreme Court by Mrs. A. Y. Armstrong, a feme sole, as relator, against Hon. J. H. Walker, Commissioner of the General Land Office, as respondent, to compel respondent to issue to relator a patent to 126½ acres of land in LaSalle County, Texas, known as the J. B. Salmon Survey No. 1, in such county,

fully described in the petition. Respondent has answered the petition. We will not attempt to detail the facts of the petition and answer; it is sufficient to say that the pleadings raise the issues we shall discuss and decide.

It appears from the record that relator is claiming right to the patent here sought by reason of the following undisputed facts:

(a)　On February 17, 1896, J. B. Salmon, describing himself as the head of a family, swore to a homestead application for the survey of the land in controversy here. This application states that Salmon claimed the land as a homestead for himself and family under the laws then provided for actual settlers. This application was filed with the county surveyor on the day it was sworn to and was recorded on February 18, 1896.

(b)　The survey of this land was had on January 30, 1896, before the application was made, and the field notes were recorded on February 25, 1896, by the county surveyor.

(c)　On the —— day of ————, 1898, exact date not shown, J. B. Salmon attempted to sell and convey this land to Mrs. Jenine May. Mrs. May conveyed to A. Armstrong, Sr., who in turn sold and conveyed to relator.

(d)　Neither J. B. Salmon nor any of his successors ever made any proof of occupancy of this land of any kind prior to January 1, 1902. In this connection the records of the General Land Office show that the first attempt to make proof of occupancy, tender of patent fees and application for patent on this land occurred in the year 1926, and not before that date.

(e)　Mrs. Jennie May, who attempted to purchase from J. B. Salmon in 1898, did not then enter upon this land and reside thereon. In this regard the records of the General Land Office, which are undisputed, show that Mrs. Jennie May owned and resided on Section 22, Certificate 1/252, J. Poitevent Survey, in LaSalle County, Texas, at the very time J. B. Salmon attempted to convey this homestead donation or claim to her in 1898, and that she continued to reside on Section 22 for more than 3 years thereafter. In this connection there is no showing in this record that Mrs. Jennie May ever lived or resided on this land. In short this record shows that at the time Mrs. Jennie May attempted to purchase this land from J. B. Salmon she owned and actually occupied and lived on another homestead in the same county.

The decision of this case involves a proper construction of chap. 8, article 4160 et seq., R. C. S. of Texas, 1895.

It will be noted that under the provisions of Article 4160, R. C. S., 1895, every person who was then the head of a family and without a homestead was entitled to receive a donation from the State of 160 acres of vacant and unappropriated public land, upon conditions and stipulations provided in the above chapter. Article 4162 of the same chapter provided, among other things, that every person who desired any portion of the public domain as a homestead should present to the surveyor of the district or county in which the land was situated his written application designating the land which he claimed, etc. Article 4163 provided that the above application should be made at the time of settlement or occupancy or within thirty days thereafter, etc. Article 4165 provided that the applicant should have certain preference rights to the land applied for by him under certain conditions. Article 4166 provided that the field notes of the survey should be returned to and filed in the General Land Office within twelve months after the date of the survey above provided for. We here deem it expedient to quote in full the following articles of R. C. S., 1895.

Art. 4167: "Whenever the field-notes of a homestead donation survey shall have been returned to the general land office according to the provisions of the preceding article, and when proof shall be made to the satisfaction of the commissioner of the general land office that the original applicant for a homestead donation has by himself, or in case the claim has been transferred, that he and his assignee have together in good faith resided upon, occupied and improved the land so claimed by him for a period of three consecutive years from the date of the application, it shall be the duty of said commissioner to issue a patent therefor to the original applicant or his assignee, as the case may be, upon payment of all the office and patent fees."

Art. 4168: "The proof required in the preceding article shall be by an affidavit of the claimant to the effect that such original applicant has by himself, or in case the claim has been transferred, that he and his assignee have together in good faith resided upon, occupied and improved said land for three consecutive years from the date of his application for a homestead donation; which affidavit shall be corroborated by the affidavit of two disinterested and credible citizens of the county or surveyor's district in which the land is situated, which affidavits shall be subscribed and sworn to before some officer authorized to administer oaths, who shall certify to the same and to the credibility of said witnesses under his hand and seal of his office."

Art. 4169: "When the original occupant or his assignee is dead, the patent shall issue to his heirs on application of the surviving widow, one of the heirs or his legal representative."

Art. 4170: "No assignment of the homestead donation right by the occupant or settler before the patent has been obtained shall be good and valid in law, unless the same be by deed duly authenticated as required by law."

Art. 4171: "Should any person claiming a homestead donation fail to make the written application as provided in this chapter, or should he fail to have the survey made and to have the field-notes thereof (duly certified to and recorded) returned to and filed in the general land office within twelve months after the date of his application, or should he or his assignor fail to make satisfactory proof that he had resided upon, occupied and improved the land claimed by him for three years after the date of his application, as provided in this chapter, he shall in either event forfeit all right and title to said land, and the same shall become subject to entry or location as other vacant and unappropriated public land."

A reading of the above quoted articles show that by various provisions it was required that the original applicant should himself, or in case his claim had been transferred, that he and his assignee together, should in good faith reside on the land for three consecutive years from the date of the application.

From the record above it appears as a matter of law, that J. B. Salmon did not live on or occupy this land for a period of three years after making his application. This is evident because the application was made on February 17, 1896, and the land was attempted to be conveyed to Mrs. Jennie May in 1898. If J. B. Salmon had lived on the land from February 17, 1896, to the close of 1898, he would not have lived thereon three years after the filing of his application. We presume from this record that he removed therefrom when he attempted to convey to Mrs. Jennie May.

■■ As already shown Mrs. Jennie May never completed J. B. Salmon's three years' occupancy. In fact she was legally incompetent to do so because at the very time of the pretended sale to her she lived on and occupied another homestead in this State. Article 4160, R. C. S., 1895; Daughty v. Hall, 59 Texas, 518.

Under the above record when J. B. Salmon, before the three years' occupancy required by law was completed, attempted to sell and convey this land to Mrs. Jennie May, and removed therefrom, he thereby abandoned all right and claim thereto.

Also since Mrs. Jennie May owned and was residing on another homestead in this State at the very time she attempted to purchase J. B. Salmon's homestead claim to this land, she acquired no right to his preemption. Upon Mrs. May's pretended purchase, and the removal of J. B. Salmon from the land before his three years' occupancy was complete, the preemption right was forfeited, and the land again became a part of the unappropriated public domain. Daughty v. Hall, supra; Garrison v. Grant, 57 Texas, 602; McCarthy v. Gomez, 85 Texas, 10, 19 S. W., 999.

In Daughty v. Hall, supra, our Supreme Court had before it a case where a party, who was then occupying a homestead in this State, attempted to purchase a homestead claim from another who had not completed the three years' occupancy required by law. The court held that the attempted purchaser acquired no right, and that the transaction resulted in the land again becoming a part of the State's public domain. We quote the following from the opinion:

"When Cagle sold his interest in the preemption to Shackelford, and removed to the state of Arkansas, he thereby abandoned all right and claim to the same. And as Shackelford then owned and was occupying another homestead, he acquired no right to the preemption. Upon his pretended purchase, and the removal of Cagle from the state, the pre-emption right was forfeited, and the land became unappropriated public domain, and subject to settlement, location and survey. Gambrell v. Steele, 55 Texas, 585."

The other cases cited fully support the above holding, and there are no authorities to the contrary.

■ There is another reason why this patent cannot issue under the record before us. It was held by this court in Hogue v. Baker, 92 Texas, 58, that at the time this preemption or donation was attempted to be perfected the public lands of this State subject thereto had already been exhausted. Under the decision in Hogue v. Baker this land belonged to the Public School Fund by virtue of Section 2 of Article 7 of our Constitution at the time this homestead preemption was attempted. After the decision in Hogue v. Baker the Legislature enacted Chapter XI, General Laws, First Called Session, 26th Legislature, 1900. This was a very comprehensive Act as is shown by the caption, which reads as follows:

"An Act to define the permanent school fund of the State of Texas, to partition the public lands between said fund and the State, and to adjust the account between said fund and said

State; to set apart and appropriate to said school fund, in part payment of said account, the residue of the public domain of said State, to which the said fund is entitled under Section 2, Article 7, of the Constitution, adopted April 17, 1876; to appropriate the sum of seventeen thousand, one hundred eighty and twenty-seven one-hundredths dollars to the permanent school fund from the general revenue not otherwise appropriated, in full payment of the balance due to said fund by the State of Texas, under the Constitution of 1876; to provide for the survey, purchase and lease of said land, and the issuance of patents in certain cases; and providing for suit in Travis County against any person claiming any of the lands belonging to the school fund or any other funds."

By certain provisions of the above Act and especially Sections 1 and 3 thereof all the unappropriated public domain, with certain exceptions not important here, was set aside and granted to the permanent school fund of the State. The Act made provision for perfecting the title to, and patenting, certain lands which had belonged to the school fund by virtue of the provisions of Section 2 of Article 7 of our Constitution, and for reimbursing the school fund therefor. Section 9 of the Act provided:.

Sec. 9: "The Commissioner of the General Land Office is hereby directed to issue patents to all homestead claimants, preemptors and other persons who settled upon said lands or purchased the same and had the field notes thereto returned to and actually filed in said Land Office prior to May 23, 1898, where the law under said settlement, pre-emption or purchase was made is complied with and patent could legally issue thereto had it not been for the decision of the Supreme Court of the State of Texas in case of Hogue v. Baker, rendered on May 23, 1898; provided, proof of occupancy shall be filed in the Land Office and payment of patent fees made and patent applied for on or before January 1, 1902."

If relator or any of her predecessors ever had any right to a patent to this land it must have been by virtue of the provisions of the Act of 1900. A reading of Section 9, supra, of such Act shows that, among other things, it was provided that proof of occupancy should be filed in the Land Office, and payment of patent fees made and patent applied for on or before January 1, 1902. This statute was never complied with or attempted to be complied with in this instance; in fact no such proceeding was ever attempted until 1926, at a time when there was no law authorizing same. Also in this instance Section 9

of the Act of 1900 could not have been complied with because the three years' occupancy required by law never occurred.

Relator contends that she is entitled to the issuance of this patent under the provisions of H. B. 474, chap. 114, Acts Regular Session, 42d Legislature, p. 193, 1931. That Act reads as follows:

Section 1. "Pre-emption surveys or homestead donations in all cases where use and occupancy can be shown for a period of twenty-five years prior to the passage of this act are hereby validated and the title thereto confirmed to the original grantees, their heirs or their assigns, and the Commissioner of the Land Office is hereby authorized and required to issue patents in accordance with the statute providing for the issuance of patents."

From a very early day in the history of this State this court has held that homestead donations such as the one here involved were pure donations. In other words, in a legal sense, they were and are nothing more than acts of sovereign grace and bounty. Causici v. La Coste, 20 Texas, 296; McKinney v. Brown, 51 Texas, 94; Grant v. Heirs of Wallis, 60 Texas, 350.

A reading of the Act of 1931, supra, shows that it is essentially a validating act. It attempts to validate and confirm to the original grantees, their heirs and assigns, all preemption surveys or homestead donations, where mere use and occupancy thereof can be shown for a period of 25 years prior to the passage of such Act. It does not even require a showing of three years' occupancy after application. It is thus manifest that the Act of 1931 attempts to validate acts of pure sovereign grace and bounty. The Act of 1931 does not attempt to validate prior sales of public land. In fact it has no remote reference to sales. Also the Act makes no attempt to reimburse the School Fund for such lands.

Section 4 of Article 7 of our Constitution reads as follows:

Section 4. "The lands herein set apart to the Public Free School fund, shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers thereof. The Comptroller shall invest the proceeds of such sales, and of those heretofore made, as may be directed by the Board of Education herein provided for, in the bonds of the United States, the State of Texas, or counties in said State, or in such other securities, and under such restrictions as may be prescribed by law; and the State shall be responsible for all

investments. (Sec. 4, Art. 7, adopted election August 14, 1883; proclamation September 25, 1883.)"

By the pertinent provisions of chap. 11, Acts First Called Session, 26th Legislature, 1900, and especially Sections 1 and 3 thereof, all unappropriated public lands of this State, with certain exceptions not important here, were set apart and granted unconditionally to the Public Free School fund of this State. Under such Act of 1900, when proof of occupancy was not filed in the General Land Office and payment of patent fees made, and patent applied for, before January 1, 1902, this land became absolutely and unconditionally the property of the said Public School fund. In fact this land became unconditionally the property of such fund as soon as the Act of 1900 became effective because no proof of occupancy could have been made, in that no three years' occupancy ever occurred.

By the plain provisions of Section 4 of Article 7 of our Constitution above quoted, it is required that the land set apart to the Public Free School fund shall be sold under such regulations as may be prescribed by law. Manifestly the above constitutional provision is exclusive in its terms and scope and operates to empower the Legislature to provide by law for the sale of the lands belonging to the Public Free School fund. Such constitutional provision further operates to deprive the Legislature of power to give away such lands. In other words the above constitutional provision operates to deprive the Legislature of the power to dispose of Public Free School Lands in any way except by sale. Empire Gas & Fuel Co. v. State, 121 Texas, 138, 47 S. W. (2d) 265. It follows that at the time the Act of 1931, supra, was passed the Legislature was without power to give away the lands belonging to the State's Public Free School Fund, or to grant such lands by acts of soreveign grace and bounty.

■ It is settled as the law of this State; in fact it is the universal rule, that "what the Legislature could have authorized in the first instance it can ratify, if at the time of ratification it has the initial authority to authorize." Anderson County Road District No. 8 v. Pollard, 116 Texas, 547, 296 S. W., 1062, and authorities there cited.

From the above rule as so aptly and correctly stated by Judge Cureton in the Anderson County Road District case, supra, it is manifest that the Legislature does not have the power to validate or ratify unless at the time it attempts to do so it also has the initial power or authority to authorize. At the time this validating act was passed the Legislature did

not have the authority to dispose of this land by gift as a homestead donation. In other words the Legislature did not have the initial authority to do that which it attempted to validate. Empire Gas & Fuel Co. v. State, supra. It follows that the validating Act of 1931 was and is utterly void because in violation of, and repugnant to, Section 4 of Article 7 of our State Constitution.

The mandamus here prayed for by relator is refused.

Opinion adopted by the Supreme Court, June 30, 1934.