

# THE ATTORNEY GENERAL

## OF TEXAS

AUSTIN, TEXAS 78711

CRAWFORD C. MARTIN
ATTORNEY GENERAL

March 14, 1969

Honorable Preston Smith
Governor, State of Texas
Capitol Building
Austin, Texas

Opinion No. M-356

Re:  Authority of the Legislature
     to reappropriate payments of
     royalties, bonuses and rentals
     from mineral leases of river
     beds, channels and areas with-
     in tidewater limits, including
     islands, lakes, bays and the
     bed of the sea belonging to
     the State of Texas, so as to
     credit all or part of these
     payments to the available
     school fund.

Dear Governor Smith:

        You have requested our opinion on the validity of an
Act of the Legislature which would reappropriate payments of
royalties, bonuses and rentals from mineral leases of river
beds, channels and areas within tidewater limits, including
islands, lakes, bays and the bed of the sea belonging to the
State of Texas, so as to credit all or part of these payments
to the available school fund.

        In Attorney General's Opinion M-347 (1969), this of-
fice stated:

        ". . . it is our opinion that anything which
    the state receives, in whatever form, in considera-
    tion of the oil taken or to be taken from the dedi-
    cated lands constitutes a part of the purchase
    price for the sale of such land or a portion there-
    of, and therefore such proceeds must be placed in
    the permanent school fund. . . ."

        The question now presented therefore concerns whether
the land referred to in your request has been dedicated to the
permanent school fund and, if dedicated, whether the Legislature
may remove such land from the fund.

        The various portions of the public domain, including
the lands described in your request, have heretofore been dedi-
cated to the permanent school fund by the Constitution of Texas

- 1755 -

and acts of the Legislature.  Sections 2 and 5, Article VII, Constitution of Texas; Articles 5415a, 5421c-3, V.C.S.

Section 2 of Article VII of the Constitution of Texas provides:

"All funds, lands and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual public school fund."

The effect of Section 2 of Article VII of the Constitution of Texas was not to vest in the school fund an undivided one-half interest of all the public domain unappropriated at the time of its adoption, but to vest in the school fund one-half of such public land as should remain unappropriated for the other purposes enumerated in the Constitution.  Hogue v. Baker, 92 Tex. 63, 45 S.W. 1004 (1898).

In State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065 (1932), the Supreme Court stated that the Constitution did not independently of legislative acts place beds of channels of navigable streams in the permanent school fund.

In determining what was placed in the permanent school fund, in Hogue v. Baker, supra, the Supreme Court in construing Section 2 of Article VII of the Constitution of Texas stated:

". . . The plain purpose of the section is to declare what shall be the school fund.  Lands theretofore set apart to that fund are preserved to it, and it is further declared that one-half of the public domain shall constitute a part of the constitutional dedication.  In our opinion, it fixed the right of the school fund in one-half of the unappropriated public domain, but left the legislature, as we have previously intimated, with extended authority over the segregation of that interest by partition of the lands or of their proceeds.  It gave to the school fund the right to an equitable half of the public domain, and in so far the provision executed itself.  . . .

"It follows from what has been said that, in our opinion, where the legislature has taken affirmative action, and has provided pro tanto for the segregation of the interest of the school fund, its action is final. . . .

". . .

"Having reached the conclusion that the half of the public domain not dedicated to the school fund has already been exhausted, and that what remains belongs equitably to that fund, it follows that the survey in controversy is not subject to location for the purpose of acquiring a homestead donation. . . ." (Emphasis added.)

Likewise it is stated in Armstrong v. Walker, 73 S.W.2d 520, 524 (Tex.Comm.App. 1934):

"By the pertinent provisions of chapter 11, Acts (1st Called Sess.) 26th Leg. (1900), and especially sections 1 and 3 thereof, all unappropriated public lands of this state, with certain exceptions not important here, were set apart and granted unconditionally to the public free school fund of this state. Under such act of 1900, when proof of occupancy was not filed in the General Land Office and payment of patent fees made, and patent applied for, before January 1, 1902, this land became absolutely and unconditionally the property of the said public school fund. In fact, this land became unconditionally the property of such fund as soon as the act of 1900 became effective because no proof of occupancy could have been made, in that no three years' occupancy ever occurred.

"By the plain provisions of section 4 of article 7 of our Constitution above quoted, it is required that the land set apart to the public free school fund shall be sold under such regulations as may be prescribed by law. Manifestly the above constitutional provision is exclusive in its terms and scope and operates to empower the Legislature to provide by law for the sale of the lands belonging to the public free school fund. Such constitutional provision further operates to deprive the Legislature of power to give away such lands.

> In other words, the above constitutional pro-
> vision operates to deprive the Legislature of
> the power to dispose of public free school
> lands in any way except by sale. Empire
> Gas & Fuel Co. v. State, 121 Tex. 138, 47
> S.W.(2d) 265. . . ."

In 1836 the Congress of the Republic of Texas defined the boundaries of the Republic of Texas, which included the lands described in your request. 1 Laws, Republic of Texas, p. 133; 1 Gammel's Laws of Texas 1193-1194.

The legal history of the State's ownership of waters and submerged lands within the tidewater limits of the Gulf of Mexico is reviewed in Butler v. Sadler, 399 S.W.2d 411 (Tex.Civ. App. 1966, error ref. n.r.e.). For the purposes of this opinion it is not necessary to review this entire history, but it may be stated that submerged lands have always been treated in a special category since the earliest days of the Republic.

It was held in State v. Bryan, 210 S.W.2d 455 (Tex. Civ.App. 1948, error ref. n.r.e.), that:

> "We think there can be no serious question
> but that the bed of Green Lake (regardless of
> its navigableness vel non) was a part of the
> public domain set aside to the permanent school
> fund. This appears from the tabulation that was
> made under Chap. XVI, p. 14, Gen.Laws, 26th Leg.,
> 1899; and from the wording of the Settlement Act
> (Chap. XI, p. 29, 1st C.S. 26th Leg., 1900, now
> Art. 5416, R.S.C., Vernon's Ann.Civ.St. Art.
> 5416), passed pursuant to that computation, the
> pertinent portion of which Act reads:
>
> "'All lands heretofore set apart under the
> Constitution and laws of Texas, and all of the
> unappropriated public domain remaining in the
> State, of whatever character and wheresoever lo-
> cated, including any lands [hereafter] recovered
> by the State, except that included in lakes, bays,
> and islands along the Gulf of Mexico within tide-
> water limits * * * is set apart and granted to
> the permanent school fund of the State.'" (Emphasis added.)

In Butler v. Sadler, supra, it was held that sub-
merged lands did not become a part of the public school fund until 1939, by the enactment of House Bill 3, Acts of the

46th Legislature, R.S., 1939, Ch. 3, p. 465. The Court pointed out that the Settlement Act of 1900 specifically provided that "this Act shall not have the effect to transfer to the school fund any of the lakes, bays, and islands on the Gulf of Mexico within tidewater limits, whether surveyed or unsurveyed."

In 1898 the Supreme Court in Hogue v. Baker, supra, judicially determined that the half of the public domain not dedicated to the school fund had already been exhausted and what remains "belongs equitably to that fund." The Court further held:

"In our opinion, it [Tex.Const., Art. VII, Sec. 2] fixed the right of the school fund in one-half of the unappropriated public domain, but left the legislature, as we have previously intimated, with extended authority over the segregation of that interest by partition of the lands or of their proceeds. It gave to the school fund the right to an equitable half of the public domain, and in so far the provision executed itself. The mode of partition or of the segregation of that half, except as to alternate certificates granted to railroad companies and other corporations, was left wholly to legislative control; and it seems to us that, if the legislature had made a partition or provided a mode of segregation, its action would have been conclusive. We see no good reason why value should not have been the guide in making a division, and, since this involved the determination of a question of fact, its action could hardly be the subject of review by the courts, unless, perchance, it should appear obviously and grossly inequitable. . . .

"It follows from what has been said that, in our opinion, where the legislature has taken affirmative action, and has provided pro tanto for the segregation of the interest of the school fund, its action is final. . . ." (Brackets ours.)

Therefore the Court in construing Section 2 of Article VII established the principle that the Constitution fixed the right of the permanent school fund in one-half of the unappropriated public domain, but left to the Legislature the mode of partition or of segregation of that half and held that where the Legislature had taken affirmative action with regard to such partition its action is final. The Legislature in 1900 passed the Settlement Act which settled permanently the division

of the public domain included in the Settlement Act. The Settlement Act (S.S.B. 2, Acts of the 26th Legislature, 1st Called Session, 1900, Ch. XI, p. 29) specifically provided:

> "Section 1. For the purpose of adjusting and finally settling the controversy between the permanent school fund and the State of Texas, growing out of the division of the public domain, there is hereby set apart and granted to said school fund four million, four hundred and forty-four thousand and one hundred and ninety-five acres or all of the unappropriated public domain remaining in the State of Texas of whatever character, and wheresoever located, including any lands hereafter recovered by the State, except that included in lakes, bays and islands along the Gulf of Mexico within tide water limits, whether the same be more or less than said four million, four hundred and forty-four thousand one hundred and ninety-five acres; provided, this act shall not have the effect to transfer to the school fund any of the lakes, bays and islands on the Gulf of Mexico within tide water limits whether surveyed or unsurveyed."

Nothing contained in the Constitution or in the cases construing Section 2 of Article VII prevents the Legislature from placing those lands excluded by Section 1 of the Settlement Act, above quoted, in the permanent school fund. The Legislature has subsequently (in 1939--Article 5421c-3, and in 1941--Article 5415a) placed these lands in the permanent school fund and it is our opinion the same rule must apply to those lands as was applied to lands contained in the Settlement Act, to wit: the legislative action is final.

Furthermore, it was held in <u>Eyl v. State</u>, 84 S.W. 607 (Tex.Civ.App. 1904, error ref.):

> ". . . If, however, on account of any defects in the certificates, or irregularities in their location or survey, said lands were not at once, upon such survey, appropriated to the school fund, they were so appropriated by the act of February 3, 1883; and in either case <u>the Legislature could not by subsequent legislation change or destroy the character of these lands as public school lands.</u> . . ."

Although it is not necessary to the conclusion reached, we note that Section 5 of Article VII of the Constitution of Texas, as amended November 3, 1964, reiterates this principle in the following language:

"The principal of all bonds and other funds, and the principal arising from the sale of the lands hereinbefore set apart to said school fund, shall be the permanent school fund, and all the interest derivable therefrom and the taxes herein authorized and levied shall be the available school fund. The available school fund shall be applied annually to the support of the public free schools. And no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever; nor shall the same, or any part thereof ever be appropriated to or used for the support of any sectarian school; and the available school fund herein provided shall be distributed to the several counties according to their scholastic population and applied in such manner as may be provided by law." (Emphasis added.)

You are therefore advised that it is our opinion that the Legislature does not have the authority to reappropriate payments of royalties, bonuses and rentals from mineral leases of river beds, channels and areas within tidewater limits, including islands, lakes, bays and the bed of the sea belonging to the State of Texas, so as to credit all or part of these payments to the available school fund.

## S U M M A R Y

The Legislature does not have authority to reappropriate payments of royalties, bonuses and rentals from mineral leases of river beds, channels and areas within tidewater limits, including islands, lakes, bays and the bed of the sea belonging to the State of Texas, so as to credit all or part of these payments to the available school fund. This can only be accomplished by constitutional amendment.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by John Reeves
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
George Kelton, Vice-Chairman
Roger Tyler
Houghton Brownlee
Alfred Walker
Harold Kennedy

W. V. GEPPERT
Staff Legal Assistant